## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

DOMINIQUE SHEPHERD,

       Plaintiff,

    v.                            **Civil Action No.  AW-03-1273**

DONALD L. EVANS, Secretary, United
States Department of Commerce

       Defendant.

_____

## MEMORANDUM OPINION

Plaintiff Dominique Shepherd ("Shepherd" or "Plaintiff") brings this employment discrimination action against her former employer alleging claims of discrimination based on her race and gender, hostile work environment based on her race and gender, and retaliation for having engaged in a protected activity, in violation of 42 U.S.C. § 2000(e), et seq., ("Title VII").  Previously, this Court issued a Memorandum Opinion and Order granting Defendant's Motion to Dismiss Plaintiff's denial of promotion claim (count I), and denying the aforementioned motion with respect to Plaintiff's remaining claims (counts II-V).  Currently pending before this Court is Defendant's Motion for Summary Judgment [27] seeking to dismiss Plaintiff's claims in the remaining counts II-V.  The Court has reviewed the pleadings and applicable law and has determined that a hearing is unnecessary.  See Local Rule 105(6) (D. Md. 2004).  For the following reasons, Defendant's Motion for Summary Judgment is granted.

## FACTUAL & PROCEDURAL BACKGROUND

I.      Factual Background

The following facts are taken in the light most favorable to Plaintiff.  Shepherd, an African-American female, served as an employee at the National Institute for Standards and Technology ("NIST"), in the United States Department of Commerce, from July 1987 until her termination in March 2003.[1]  Hired in 1987, Shepherd worked for NIST as a Material Research Engineer in Boulder, Colorado.  In August of 1992, Shepherd was reassigned to serve as a Material Research Engineer in NIST's Metallurgy Division in Gaithersburg, Maryland.  Until January 1997, however, Shepherd was on leave without pay ("LWOD") status while she pursued a Ph.D., in titanium-aluminum intermetallic alloys, at the University of Cincinnati.

Upon returning from LWOP status in January 1997, Shepherd worked as a ZP-II grade (the equivalent to a GS-9/10 career path) Materials Research Engineer at NIST's Metallurgy Division in Gaithersburg, Maryland.  In March 1999, Shepherd received her Masters degree and was promoted to a ZP-III (the equivalent to a GS-11/12 career path) Materials Research Engineer.

As a ZP-III Materials Research Engineer, Shepherd's job duties included conducting materials performance research in the area of lead-free plumbing solders and the forming of lightweight materials.  Shepherd's area of expertise was the study of "the deformation of materials with time and relatively low temperature" an area known as "creep."  As such, Shepherd was required to carry out experiments and develop apparatuses to study elevated temperature deformation and failure of metals and alloys.  Shepherd was further required to characterize the microstructure of these materials, to analyze her results using a

---

[1] Shepherd's termination is not at issue in this case as neither the complaint nor amended complaint raise any allegation concerning Shepherd's termination of employment.

highly developed knowledge of materials and their properties, processing, uses, and behavior at elevated temperature, and prepare reports of her findings.

Additionally, after returning from LWOP status in January 1997, NIST permitted Shepherd to continue working on the completion of her Ph.D research and thesis on official NIST time by including it in Shepherd's performance plan.  In March and April of 2001, Shepherd's immediate supervisor, Group Leader Dr. Richard Fields, and her second-level supervisor, Metallurgy Chief Dr. Carol Handwerker, met with Shepherd to express concerns about her progress on her research and Ph.D.

Beginning in October 2000, Shepherd discussed her desires to be promoted to the ZP-IV level, the equivalent of a GS-13/14 pay level.  Based on her performance evaluations, Shepherd believed she had demonstrated the appropriate knowledge, skills, and abilities to warrant a promotion to ZP-IV status. In September 2000, Shepherd achieved a performance rating of 69 out of 100.  In April 2001, the mid-year, Shepherd received the highest rating eligible.  On September 27, 2001, Shepherd received a 53 out of 100, the lowest performance rating in the group, a score that was still in the "eligible" range.  Shepherd never received the promotion she sought.

On October 30, 2001, Dr. Handwerker gave Shepherd a "punitive memorandum" outlining various performance deficiencies and giving Shepherd suggestions on how to improve.  In her memorandum, Dr. Handwerker noted that:  (a) there were "serious discrepancies" between what Shepherd had listed as accomplishments for her 2001 performance rating, and what she had actually done in three of her four critical elements under the 2001 performance plan; (b) Shepherd had failed to make significant progress on the completion of her Ph.D during 2001; and (c) Shepherd's performance was considered marginal and she was having difficulty demonstrating the ability to work independently to conduct experimental research,

3

data analysis, or interpretation expected at the ZP-III level.

Dr. Handwerker's October 30, 2001 memorandum also informed Shepherd that it was required, among other things, that she was to spend all of her official duty time on the completion of her creep analysis of lead-free solders. To facilitate completion of the project on the creep of lead-free solders, Dr. Handwerker's October 30, 2001 memorandum also instructed Shepherd to discontinue work on her Ph.D thesis during official duty time. Additionally, the memorandum instructed Shepherd "not to engage in any professional development or external activities during [] duty hours" without Dr. Handwerker's approval.

During a January 4, 2002 meeting, in a further attempt to discuss the possibility of advancement, Shepherd provided Dr. Fields and Dr. Handwerker with a list of her accomplishments for the first quarter of fiscal year 2002. This list contained two accomplishments relating to her Ph.D, which Shepherd previously had been directed not to work on during official time. Also, during this meeting, Dr. Handwerker asked Shepherd for copies of three of the documents that she had listed on her accomplishments report. Although Shepherd stated that she would provide those papers on January 7, 2002, Shepherd did not provide Dr. Handwerker with the documents requested.

On January 28, 2002, Shepherd received another "punitive memorandum" from Dr. Handwerker officially reprimanding Shepherd for failure to follow supervisory instructions. Specifically, Dr. Handwerker reprimanded Shepherd for working on her Ph.D project during official time after having been given specific instructions not to do so, and for failing to work on tasks assigned to her in her 2002 performance plan. The reprimand also addressed Shepherd's failure to give Dr. Handwerker, in a timely manner, copies of papers she had requested on January 4, 2002. This reprimand was a temporary document that would be removed from Shepherd's personnel file after one year. The following day, January 29, 2002, Shepherd

was informed, via e-mail, that she needed to provide a copy of the requested documents by 8:30 a.m. the next day, or be subject to discipline. Shepherd provided management with a copy of the documents as requested, and was never disciplined.

In April 2002, Shepherd sought an assignment to the World Trade Center ("WTC") investigation. Congress had asked NIST to investigate the structural causes underlying the collapse of the twin towers. Shepherd was not chosen to work on the WTC investigation.

In May 2002, Shepherd sought approval to travel to the June 2002, American Society of Mechanical Engineers ("ASME") Turbo Expo Conference, in the Netherlands, to present a research paper on titanium aluminides. This paper did not involve a program or project supported by NIST, but was related to Shepherd's Ph.D work. Following procedures, Dr. Handwerker forwarded Shepherd's travel request to Deputy Laboratory Director Dr. Stephen Frieman, who informed Dr. Handwerker that he would not approve Shepherd's international travel request. The trip was projected to cost approximately $3,000.00

In July 2002, Dr. William Luecke, a white male, was affected by a reduction-in-force ("RIF") in the Ceramic Division. As part of the RIF, Dr. Luecke, was reassigned to the Metallurgy Division and assigned to the WTC investigation. The central focus of Shepherd's Performance Improvement Plan ("PIP") — a mechanism designed to monitor and improve employee performance where such performance had fallen below the acceptable levels — was the creep of lead-free solders. The primary creep research project in the Metallurgy Division is the project on the creep of lead-free solder alloy. Shepherd alleges that Luecke, who was trained in silicon nitride ("ceramics"), rather than steel, was hired to perform the WTC creep work and that Shepherd was prohibited from performing creep work after Luecke's hiring.

On July 17, 2002, Dr. Handwerker placed Shepherd on a PIP.  On July 25, 2002, Shepherd's

new group leader, Dr. Ridder, issued a revised PIP.  In December 2002, Shepherd submitted the PIP with

her work completed.  Between December 3, 2002, and the filing of the first complaint in this case,

Shepherd received no additional work.

II.      Procedural Background

On December 12, 2001, Shepherd first initiated contact with an EEO counselor alleging disparate

treatment based on race and gender.  After EEO counseling failed to resolve the issues, Shepherd filed a

formal complaint of discrimination.  On May 9, 2002, Shepherd's formal complaint was accepted for

investigation.  Pursuant to applicable regulations, after 180 days Shepherd had the right to either request

a hearing before an EEOC Administrative Law Judge ("ALJ") or file a complaint in Federal court.  See 29

C.F.R. §§ 1614.108(f) and 1614.408(b).  On October 23, 2002, Shepherd requested a hearing before

an EEOC ALJ, however this request was withdrawn when the instant action was filed in Federal court.

On April 10, 2002, Shepherd made contact with another EEO Counselor and complained that she

had been the victim of retaliation in response to the filing of her first complaint.  After EEO counseling failed

to resolve the issues, on May 24, 2002, Shepherd filed a formal complaint of discrimination.  On

September 16, 2002, Shepherd's second EEO complaint was accepted for investigation.  On September

30, 2002, pursuant to applicable regulations, Shepherd requested a hearing before an EEOC ALJ,

however this request was withdrawn when Shepherd filed the instant action.

On April 29, 2003, Shepherd filed a complaint in this Court, pursuant to Title VII, alleging

employment discrimination based on claims of failure to promote, hostile work environment based upon

her race and gender, and retaliation for having engaged in protected activity.

On December 8, 2004, Defendant filed a Motion to Dismiss and for Summary Judgment.   On February 24, 2004,  this Court entered a Memorandum Opinion and Order granting-in-part, and denying-in-part, Defendant's motion.   With respect to Shepherd's failure to promote claim (count I), this granted Defendant's motion to dismiss on the basis that Shepherd failed to exhaust her administrative remedies.  With respect to Plaintiff's remaining claims (counts II-V), this Court denied summary judgment, as inappropriate at that time, "to afford the parties an opportunity to adequately develop the record."

Following the close of discovery, Defendant's filed a Motion for Summary Judgment on December 8, 2004.  That motion is ripe, and an opinion is now issued.

## STANDARD OF REVIEW

Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324-25 (1986).   Once the moving party discharges its burden by showing there is an absence of evidence to support the nonmoving party's case, <u>Catrett</u>, 477 U.S. at 325, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).   Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

## DISCUSSION

Shepherd asserts various discrimination and retaliation claims, based on race and gender, pursuant to Title VII.  Specifically, Shepherd alleges that (1) she was given a "punitive memorandum" on October 31, 2001, prohibiting her from continuing to work on her Ph.D and from participating in NAAS; (2) she

was given an official reprimand on January 28, 2002, for failing to follow supervisory instructions and was

threatened with additional discipline, the following day, if she failed to submit a required document to her

supervisor; (3) she was denied the opportunity to work on the WTC investigation and she was prohibited

from traveling internationally to a scientific conference in the Netherlands; and (4) that because Dr. Luecke,

a white male scientist, was hired into her Division she was prevented from performing additional creep

work and was placed on a PIP.

In order to prevail in her action under Title VII, Shepherd must meet his burden of proof under the

three-stage burden shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973). The Fourth Circuit has stated that the McDonnell Douglas burden-shifting framework is applicable

to retaliation claims. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222,1228 (4th Cir. 1998).

Under the McDonnell Douglas scheme, a plaintiff must initially establish by a preponderance of the

evidence a prima facie case of employment discrimination. Bailey v. Anne Arundel County, 259 F.Supp.2d

421, 425 (D. Md. 2003). Once the plaintiff has established a prima facie case of discrimination, the

defendant may respond by producing evidence that it acted pursuant to a legitimate, nondiscriminatory

reason, and then the plaintiff may adduce evidence showing that the defendant's proffered reason was mere

pretext and that race was the real reason for the defendant's less than favorable treatment of the plaintiff.

Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004). Although the evidentiary burdens shift back

and forth under the framework, the "ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dept. of Cmty.

Affairs v. Burdine, 450 U.S. 248, 253 (1981).

**A.     Prima Facie Case of Discrimination & Retaliation**

To prove a prima facie case of race or sex discrimination, a plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for the job and her performance was satisfactory; (3) she suffered an adverse employment action; and (4) other similarly situated employees outside the protected class were treated more favorably.   Taylor v. Va Union Univ., 193 F.3d 219, 233 (4th Cir. 1999) (en banc).

To establish a prima facie case of retaliation, a plaintiff must prove that:  (1) she engaged in a protected activity under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action taken against her. Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002).

An adverse employment action can be proved if a plaintiff establishes that the challenged action "adversely affects the terms, conditions, or benefits of the plaintiff's employment." Von Guten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001) (internal quotations omitted).  Conduct short of "ultimate employment decisions" can constitute adverse employment actions.  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004).  However, the Fourth Circuit has emphasized that such acts must have "some significant detrimental effect" on the plaintiff.  Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999).

### i.        Count II:  October 30, 2001 Memorandum

Shepherd first contends that she suffered an adverse employment action as a result of Dr. Handwerker's October 30, 2001 memorandum.   In particular, Shepherd alleges that because this memorandum instructed Shepherd to devote all of her official duty time for her Ph.D work on creep analysis of lead solder project and to seek permission before engaging in external activities while on official

government time, those actions constituted adverse employment actions.  This Court cannot agree.

Other than conclusory allegations of a "punitive memorandum", Shepherd has failed to show that the October 30, 2001 memorandum had any effect on the terms and conditions of her employment.  See Evans v. Tech. Applications & Servs., Co., 80 F.3d 954, 960 (4th Cir. 1996) (stating that conclusory allegations and unsupported speculation is insufficient to withstand summary judgment review).  While NIST permitted Shepherd to work on her Ph.D project on official time, the record shows that this arrangement was intended to be a temporary accommodation, rather than a permanent accommodation, with the expectation that Shepherd would complete her Ph.D in a reasonable period of time.  Moreover, Shepherd continued to be permitted to use NIST equipment to perform work on her Ph.D during non-official time.  Thus, requiring Shepherd to concentrate on NIST-related work during official duty hours cannot be considered an adverse employment action.

Nor can this Court find that Shepherd's participation in NAAS activities was limited by Handwerker's October 30, 2001 memorandum.  Shepherd claims that the October 30, 2001 memorandum was not simply a form of discrimination or harassment, but was also retaliation in response to her activities with NAAS and her participation in a class action suit.

The October 30, 2001 memorandum merely instructed Shepherd "not to engage in any professional development or external activities during [her] duty hours except as approved" by Dr. Handwerker.  The record is devoid of any showing that Shepherd actually sought approval to attend NAAS meeting during duty hours.  Nor has Shepherd alleged or demonstrated that Dr. Handwerker would have denied such a request had it been made.  Moreover, the record shows that  Shepherd was not prevented from using non-duty hours to attend NAAS meetings.  In fact, the record shows that Shepherd works a maxi-flex schedule,

10

which allows her to set her own work hours as long as she works 80 hours in a two-week period. Consequently, Shepherd was able to attend NAAS activities by simply adjusting her work schedule.

Even more importantly, Shepherd has not alleged, nor does the record show, that the October 30, 2001 memorandum's instructions changed her grade, salary, benefits, work hours, or any other actionable aspect of her employment with NIST. Even if such instructions had resulted in a slight alteration of Shepherd's duties, such a result would not constituted an adverse employment action. See Raley v. Bd. of St. Mary's County Commrs., 752 F.Supp. 1272, 1281 (D. Md. 1990) (assignment to clerical tasks do not constitute adverse employment actions); Ward v. Johns Hopkins Univ., 861 F.Supp. 367, 377 (D. Md. 1994) (alleged retaliation consisting of not speaking to plaintiff and giving her less favorable assignments in the "dirtier" part of the basement did not amount to adverse employment actions). Hence, Shepherd has failed to show a prima facie case of discrimination or retaliation with respect to Count II.

ii.      *Count III: January 28, 2002 Reprimand*

In Count III of the Amended Complaint, Shepherd alleges a cause of action based on discrimination and retaliation against Shepherd for filing an informal EEOC complaint. In particular, Shepherd alleges that she was given an official reprimand on January 28, 2002 for failing to follow supervisory instructions and was threatened with additional discipline, the following day, if she failed to submit a required document to her supervisor constitute adverse employment actions. Plaintiff's arguments cannot establish an adverse employment action.

This Court has repeatedly held that discipline by reprimand, without evidence that the warning could lead to further disciplinary action, such as termination, does not constitute an adverse employment action. See Newman v. Giant Food, Inc., 187 F. Supp. 2d 524, 528-29 (D. Md. 2002) (stating that

verbal warning and counseling letter did not constitute an adverse action); <u>Finnegan v. Dep't of Public Safety and Correction Servs.</u>, 184 F.Supp.2d 457, 461 (D. Md. 2002) (stating that receipt of verbal reprimand and subsequent counseling letter did not constitute adverse action); <u>Nye v. Roberts</u>, 159 F.Supp.2d 207, 213-14 (D. Md. 2001) (holding that a written reprimand did not constitute an adverse action because "reprimands do not automatically affect the terms and conditions of employment"). Here, no monetary consequences attached to the reprimand. The reprimand did not require Shepherd to leave the work place nor did it have any effect on her duties or cause her to lose pay. Because Shepherd has not shown that the terms and conditions of her employment were affected, the January 28, 2002 reprimand does not constitute an adverse employment action.

  *iii.*    *Count IV: International Travel & WTC Investigation*

  In Count IV, Shepherd alleges discrimination and retaliation against her for filing a formal EEOC complaint alleging race and sex based discrimination. In particular, Shepherd points to her denial of international travel to the ASME conference in the Netherlands as constituting an adverse employment action.

  The Fourth Circuit, however, has emphasized that management's repeated refusals to permit a plaintiff from attending seminars does not constitute adverse employment actions. <u>Von Guten</u>, 243 F.3d at 869 (finding that supervisor "often turned down [plaintiff's] requests to attend seminars" did not constitute an adverse employment action); <u>see</u> <u>also</u> <u>Dollis v. Rubin</u>, 77 F.3d 777, 779-80 (5th Cir. 1997) (finding that employee's allegation that she "was refused attendance at a training conference" was at most "tangential" to future decisions that might be ultimate employment actions).

  Moreover, the record shows that five other employees, all white men, were denied international

travel requests at approximately the same time as Shepherd's denial.  Hence, Shepherd has not shown that similarly situated employees were treated differently.  Additionally, the record shows that at the time Dr. Freiman denied Shepherd travel to the Netherlands, he had no knowledge of her protected activity.  <u>See e.g.</u>, <u>Bedford v. S.E. Penn. Transit Auth.</u>, 867 F. Supp. 288, 293 (E.D. Pa. 1994) ("If the person who decided that the plaintiff should be terminated had no knowledge that she engaged in the protected activity in question, then clearly he could not have retaliated against her for so doing.").  Thus, even assuming Shepherd can show an adverse employment action, Shepherd cannot show a causal connection between her protected activity and the adverse employment action.

Shepherd also seeks to prove that the denial of an opportunity to work on the WTC investigation constitutes discrimination and retaliation.  An employee's mere unhappiness with an employer's decision does not constitute an adverse employment action.  <u>See</u> <u>Allen v. Rumsfield</u>,  273 F. Supp. 2d 695, 705 (D. Md. 2003) ("An action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of employment, is not an adverse employment action.").  Here, even if Shepherd had been assigned to work on the WTC investigation, her pay grade, salary, and job title would not have changed.  Hence, the denial of the opportunity to work on the WTC investigation cannot be considered an adverse employment action.

Additionally, the record shows that among the personnel from the Metallurgy Division that worked on the WTC investigation were Sandy Claggett, an African-American female, and Rodney Jiggetts, an African-American male.  Thus, Shepherd has failed to show that a denial of an opportunity to work on the WTC investigation constituted an action where similarly situated persons were treated differently than her.

     *iv.*    *Count V: Prevented from Additional Creep Work & PIP Placement*

Shepherd also cannot establish that she was subject to any adverse action with regard to her claim that she was forced to work with Dr. Luecke, and that some of her duties were transferred to him.  This Court has emphasized that "absent a change in title, compensation, responsibility or working conditions, a mere transfer does not amount to an adverse employment action."  Caussade v. Brown, 924 F. Supp. 693, 700 (D. Md. 1996), aff'd, 107 F.3d 865 (4th Cir. 1997).

As applied here, Shepherd has not claimed that she suffered any loss in title, salary, or benefits.  Nor has Shepherd claimed that the critical elements of her performance plan were significantly reduced or modified as a result of Dr. Luecke's transfer.  Moreover, the record shows that following his transfer to the Metallurgy Division, Dr. Luecke did not take over any job duties assigned to Shepherd or that had been given to Shepherd.  Quite the contrary, the primary creep research project in the Division remained Shepherd's project on lead-free solder alloys, and Shepherd was still in charge of the creep machines in the lab after Dr. Luecke's transfer.  In fact, Dr. Luecke did not perform any high temperature mechanical testing until April 2003 and has not used Shepherd's creep equipment.  Moreover, contrary to Shepherd's allegation that she was prevented from performing creep work, the central focus of Shepherd's PIP was an analysis of the creep of lead-free solders.

Additionally, Shepherd challenges Handwerker's placement of her on a PIP.  This Court has previously emphasized that the mere placement of a federal employee on a PIP is not an adverse employment action.  Jeffers v. Thompson, 264 F. Supp. 2d 314, 329 (D. Md. 2003) (stating that a "PIP simply does not amount to a redressable adverse employment action").  Here, neither Shepherd's original nor amended complaint allege an action predicated on Shepherd's termination after she failed the PIP.  Even assuming the PIP constituted an adverse employment action, Shepherd has failed to establish a prima

14

facie case.  Shepherd does not demonstrate any person outside the protected, whose performance was as deficient as hers, was better treated.

In short, Shepherd's claims in Counts II through V must be dismissed, as a matter of law, because Shepherd has failed to show a prima facie case of discrimination or retaliation.

### B.      Legitimate Non-Discriminatory Rationales & Pretext

Even assuming that Shepherd could establish a prima facie case of race, sex, or retaliation discrimination, summary judgment is appropriate because Shepherd cannot establish that Defendant's legitimate, non-discriminatory reasons are merely a pretext.

Defendant's legitimate, non-discriminatory reason for giving Shepherd the October 30, 2001 memorandum was because of their concerns regarding her performance, including her lack of accomplishments in the critical elements of her performance plan, her failure to make suitable progress on her Ph.D, and her repeated failure to submit certain required documents to her supervisors.  Defendant further alleges that the intent of this counseling memorandum was to encourage Shepherd to complete her analysis of the creep-lead free solders so that she could be assigned to the PFLM project, which was a high priority NIST approved/funded project with high visibility with U.S. automotive manufacturers and metal suppliers.

The record is devoid of any evidence that Defendant's articulated reasons for issuing this memorandum is untrue or a pretext for race or sex discrimination or were in reprisal for her informal EEO complaint.  Although Shepherd alleges that the October 30, 2001 memorandum was "punitive," Shepherd has failed to bring forth any evidence to show that this memorandum was punitive in nature.  This memorandum noted that Shepherd has failed to meet performance goals NIST had established for her, and

it gave examples of discrepancies between what Shepherd claimed to have accomplished in the year ending in September 2001 and what she had actually accomplished.  The memorandum then instructed Shepherd to "focus all of [her] time and energy on the completion . . . [of] the project on lead-free plumbing solders." The memorandum established a mentor for Shepherd to meet with in bi-weekly meetings, instructed her to stop working on her doctorate as part of her work duties, and instructed her to attain Handwerker's approval for "professional development" or "external activities."  Taken as a whole, the record shows that the memorandum was designed not be punitive, but rather to improve Shepherd's job performance.

Defendant's legitimate, non-discriminatory reason for giving Shepherd a "reprimand" on January 28, 2002 was that Shepherd repeatedly failed to produce documents that her supervisor requested, as a result, the memorandum was merely a temporary document that would be removed from her personnel file after one year.  After Shepherd failed to produce requested documentation again during her January 28, 2002 meeting with Dr. Handwerker, she was threatened with additional discipline.  Because Shepherd ultimately submitted the required documentation she was not subject to further discipline.  The record is devoid of any evidence that Defendant's articulated reason is merely a pretext.

Defendant's legitimate, non-discriminatory reason for denying Shepherd the opportunity to work on the WTC investigation was that NIST was given a limited amount of funds to complete the WTC investigation and that NIST was specifically forbidden from supplementing these funds with money from other sources.  Consequently, Defendant contends that only a limited number of the most experienced and productive staff members were selected for the project.  The record shows that Shepherd clearly was not one of the most experienced or productive members of the Metallurgy Division.  Indeed, the record shows that Shepherd, at the time, was not completing her primary job duties and was about to be placed on a PIP

16

due to her unacceptable performance.  Moreover, the employees working on the WTC investigation included Sandy Claggett, an African-American female, and Rodney Jiggetts, an African-American male. Thus, there is no evidence that NIST's failure to select Shepherd for the WTC investigation was based on anything other than her experience and performance.

Defendant's legitimate, non-discriminatory reason for denying Shepherd international travel was that her $3,000.00 foreign travel request was too expensive.  The record shows that Shepherd's travel request was made in 2002, a time when division budgets within MSEL were "tight" and a RIF had begun in MSEL's Ceramics Division.  Shepherd was not giving a keynote or plenary address at the ASME conference and her paper could have been presented to an audience at a technical meeting within the United States at less cost.  The record also shows that MSEL denied several other foreign travel requests during the same period of time that were submitted by scientists outside Shepherd's protected classifications.  Additionally, Freiman was unaware of Shepherd's EEO complaint at the time he made his decision to deny Shepherd's travel request.  Accordingly, Shepherd cannot demonstrate that this decision was a pretext.

Defendant's legitimate non-discriminatory reason for assigning Dr. Luecke to the Metallurgy Division was that he was added as a result of a RIF that was conducted in the Ceramics Division or that he was added to the WTC investigation due to his expertise in high temperature deformation of materials. Shepherd has brought forward no evidence to show that this reason for assigning Dr. Luecke to the Metallurgy Division was merely a pretext.

Defendant's legitimate non-discriminatory reason for placing Shepherd on a PIP was that Handwerker, Dr. Fields, and Dr. Ridder each had serious concerns about Shepherd's performance as a

ZIP-III.  The record shows that Shepherd was placed on her PIP because she failed to demonstrate appropriate progress on her primary assignment — the analysis of lead-free solders.  It is undisputed that Shepherd's samples for the analysis of lead free solders project were damaged and that Shepherd had not organized her micrographs in an appropriate systematic manner.  As a result of Shepherd's poor sample preparation and laboratory procedures and her faulty analysis, her work on this critical project was incorrect and needed to be redone.  Shepherd has failed to present any evidence to show that Defendant's legitimate, non-discriminatory reasons are pretextual.

### C.      Prima Face Case of Hostile Work Environment

Shepherd also asserts, in counts III -V, that she was subjected to a hostile work environment based on her race or gender.  To support her hostile work environment claim, Shepherd alleges that she was "repeatedly placed under restrictions that no one else was" because she (1) was forced to abandon work on her Ph.D; (2) had to report to supervisors when they felt it was necessary; (3) had to step down from her position as the Vice President of NAAS; and (4) was denied the opportunity to work on the prestigious WTC project.  In the background of each of these incidents is Shepherd's contention that Handwerker, while perhaps not motivated directly by race or gender, was motivated to take those actions in response to her EEOC complaints.  This Court cannot agree.

To sustain a claim of hostile work environment under Title VII, a plaintiff must show:  (1) that she belonged to a protected class; (2) the conduct in question was unwelcome; (3) that the harassment was based on the protected characteristic in question; (4) that the harassment affected a term, condition or privilege of employment; and (5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action.  <u>Paroline v. Unisys Corp.</u>, 879 F.2d 100, 105 (4th Cir. 1989),

vacated in part on other grounds, 900 F.2d 27 (4th Cir. 1990).

To succeed on a hostile work environment claim, a plaintiff must demonstrate that the harassment she is complaining of was based on impermissible factors, i.e., race, or gender.  See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1997).  Therefore, in order for any of the above incidents to support her claim, Shepherd "must set forth specific evidence to show that the incident was not merely negative or motivated by dislike from a supervisor, but that it was motivated improperly by race [or gender]."  Nicole v. Grafton, 181 F. Supp. 2d 475, 483 (D. Md. 2002).  Unspecific or merely conclusory allegations are insufficient to support a hostile work environment claim.  Causey, 162 F.3d at 801-02.

As applied here, Shepherd sets forth no evidence, apart from her own speculation, that Handwerker or any other NIST employee was motivated to undertake any of the above four incidents as a result of racial or gender animus or as a result of her EEOC complaints.  In particular, Shepherd does not recount a single incident where any NIST employee made comments, chastised, or even mentioned her race or gender.  Moreover, this Court's review of the record shows that Shepherd was not treated differently than similarly situated scientists outside of her protected class with regard to performance ratings, duties, counseling, overseas travel, and work opportunities.

Even assuming that the above four incidents were based on race or gender, Shepherd has not established that these incidents were sufficiently severe or pervasive to objectively constitute a hostile work environment.  In order to support a claim for hostile work environment the alleged conduct must not only "create an objectively hostile or abusive work environment, [but the] victim  must also perceive the environment to be abusive."  Spriggs v. Diamond Auto Glass I, 242 F.3d 179, 184 (4th Cir. 1999).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment —

19

an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In determining whether discriminatory conduct was sufficiently pervasive or severe, the Court must look to the totality of the circumstances.[2]

Here, Shepherd's complaint is devoid of the type of conduct that constitutes a "sufficiently severe or pervasive" environment. Shepherd has not alleged, nor does the record show, that Shepherd suffered any physically threatening or humiliating conduct. Nor does the evidence show that Shepherd suffered any verbal, racial, or sexual comments, slurs, or teasing. Quite the contrary, the instances Shepherd points to merely demonstrates that she disagreed with certain management decisions. See Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (stating that "a poor personal relationship between the parties is not a protected basis under Title VII"). Hence, Shepherd's claim of hostile work environment must be dismissed for failure to show a prima facie case.

**CONCLUSION**

For the aforementioned reasons, the Court GRANTS Defendant's Motion for Summary Judgment. An Order consistent with these rulings shall follow.

July 14, 2005                                             /s/

---

[2] Among the circumstances a Court must look to are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Smith v. First Union Nat. Bank, 202 F.3d 234, 242 (4th Cir. 2000) (internal citations omitted).

Date                                    Alexander Williams, Jr.
                                        United States District Judge